**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AB Z.,

*Plaintiff,*

*v.*

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_______________________________/

Case No. 2:26-cv-10517

Susan K. DeClercq
United States District Judge

Patricia T. Morris
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 14)**

## I. RECOMMENDATION

For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's motion for summary judgment (ECF No. 13) be **GRANTED** and Defendant the Commissioner of Social Security's motion for summary judgment (ECF No. 14) be **DENIED**. The final decision of the Administrative Law Judge (ALJ) should be **VACATED** and this matter **REMANDED** for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

## II. REPORT

### A. Introduction and Procedural History

On July 3, 2022, Plaintiff filed applications for disability insurance benefits

and supplemental security income, alleging disability beginning June 30, 2022. (ECF No. 10-1, PageID.52). The Commissioner initially denied the applications on February 13, 2023, and on reconsideration on May 17, 2024. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on April 2, 2025. (*Id.* at PageID.52, 96–127). The ALJ issued a written decision on April 30, 2025, finding that Plaintiff was not disabled. (*Id.* at PageID.49–77). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on December 12, 2025. (*Id.* at PageID.43–47).

Following the denial of review, Plaintiff sought judicial review on February 13, 2026. (ECF No. 1). The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 13, 14, 15).

**B. Standard of Review**

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is

not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

**C. Framework for Disability Determinations**

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined

through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he

or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 30, 2022. (ECF No. 10-1, PageID.54).

At Step Two, the ALJ found the following impairments severe: obsessive-compulsive disorder (OCD); depression; anxiety; post-traumatic stress disorder

(PTSD); attention deficit hyperactivity disorder (ADHD); traumatic brain injury (TBI)/whiplash cranio-cervical syndrome; migraines; and asthma. (*Id.* at PageID.55). At Step Three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.56).

Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance as defined in the SCO of the DOT; occasionally stoop, kneel, crouch, and crawl; occasional overhead reaching, bilaterally; avoid concentrated exposure [to] extreme cold, extreme heat, and even moderate exposure to hazards, such as unprotected heights and unguarded moving mechanical parts; avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants - as defined in the Selected Characteristics of Occupations of the DOT; understand, remember, and carry out simple instructions and tasks; frequent interactions with coworkers and supervisors, occasional interaction with the public.

(*Id.* at PageID.58).

At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.67). However, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.68). Specifically, the ALJ found that Plaintiff could perform the requirements of a sorter (931,000 jobs in the national economy), a distributing clerk (174,000), and a file clerk II (17,000). (*Id.* at PageID.69). The ALJ thus concluded that Plaintiff was "not disabled." (*Id.*).

### E. Administrative Record

Plaintiff raises three issues on appeal. The first two issues concern the ALJ's consideration of Plaintiff's migraines. As will be explained below, the Undersigned finds that Plaintiff's first two arguments are meritorious and warrant remand. The Undersigned thus need not reach Plaintiff's third argument. *See Jandt v. Saul*, No. 1:20-CV-00045, 2021 WL 467200, at *11 (W.D. Ky. Feb. 9, 2021) ("Considering the conclusion reached above, the Court declines to address Plaintiff's other challenges to the final decision of the Commissioner."). While the Undersigned has reviewed the entire record, she will only summarize the evidence relevant to Plaintiff's first two issues on appeal.

On August 15, 2022, Plaintiff was injured in a motor vehicle accident. (ECF No. 10-1, PageID.709). She hurt her left hand and wrist and sustained whiplash like injuries to her neck and left shoulder. (*Id.* at PageID.702–05, 709–10). Treatment of these injuries predominates the medical record for the next several months. (*See, e.g.*, *id.* at PageID.726–56, 763–71, 775–87, 791–96, 817–50, 871–72, 882–929, 936–68, 1044–50).

At a September 23, 2022 chiropractic appointment, Plaintiff presented with a "bad headache," which she attributed to not taking painkillers that day. (*Id.* at PageID.784). Plaintiff said her symptoms included "constant pressure in her head" and sensitivity "to light and sound." (*Id.*). Similarly, at her September 30

appointment, Plaintiff reported having “a sinus headache in addition to the concussion headache,” for which taking 800 mg of ibuprofen “barely helped.” (*Id.* at PageID.786). On October 4, Plaintiff complained about daily headaches and neck pain as well as light sensitivity. (*Id.* at PageID.787).

On January 13, 2023, Plaintiff presented to an appointment with a severe headache. (*Id.* at PageID.1040). Plaintiff described her regular headaches as follows: “[Headaches] over the whole head recurring for 2.5 wks with eye pain and worse now since not wearing the glasses. Not taking anything in the day, trying to eat and drink to help. Starts 1/2 way through the day but earlier today.” (*Id.*). The reason for Plaintiff’s headaches was not discussed, but the chief complaint for the visit was “concussion sequalae.” (*Id.*). A record from the month prior notes, “Concussion in MVA on 8/15/22 with post concussion syndrome with headaches, memory, concentration and focus deficits, tinnitus and balance deficits.” (*Id.* at PageID. 1044).

In a February 2023 email, Plaintiff informed her provider that she planned to get bloodwork done that week “headaches allowing.” (*Id.* at PageID.1037). On March 3, Plaintiff told the provider that she was in pain and requested that the lights be turned off for her visit. (*Id.* at PageID.1036). A few weeks later, Plaintiff told the same provider that dealing with insurance paperwork gave her headaches. (*Id.* at PageID.1034).

Plaintiff was injured in another motor vehicle accident on August 3, 2023. (*Id.* at PageID.984–1002). Plaintiff presented to the emergency department with pain in her chest, neck, and right wrist. (*Id.*). At an appointment later that month, Plaintiff's provider noted:

> Prior to this accident patient['s] headaches had resolved, she had mild dizziness, speech changes had resolved, and had improvement in sensory overwhelm. Since accident, patient had a severe headache and neck pain. Patient has whiplash from the accident resulting in sprain of ligaments of cervical spine. Patient additional [sic] meets criteria for a concussion.

(*Id.* at PageID.1068). Additionally, records from May 5 through July 28, 2023, indicate that this provider attributed Plaintiff's ongoing headaches to the first motor vehicle accident, saying Plaintiff "more likely than not has post-concussive syndrome." (*Id.* at PageID.1089–1129). On August 30, this provider prescribed Plaintiff the migraine medication Sumatriptan. (*Id.* at PageID.1136).[1] Plaintiff continued to report frequent headaches through October 31, 2023. (*Id.* at PageID.1159).

On February 19, 2024, Plaintiff was seen by a neurologist who summarized her report of physical symptoms as follows:

> The patient reports multiple head injuries and meningitis. She was hit

---

[1] "Sumatriptan is used to treat acute migraine headaches in adults. It is not used to prevent migraine headaches and is not used for cluster headaches. Sumatriptan works in the brain to relieve the pain from migraine headaches. It belongs to the group of medicines called triptans." https://www.mayoclinic.org/drugs-supplements/sumatriptan-oral-route/description/drg-20074356 (last visited Aug. 5, 2026).

> by three different cars in a years [sic] time frame while living in Portland Oregon. The first, she had a post traumatic concussion with a neck injury and multiple sprains. 12 months later, she was hit again. A month after the second accident, she was hit as a pedestrian when getting out of an Uber. She reports severe vertigo and she couldn't walk for months, she had to use a cane. Followed up with chiropractor which helped, she reports vertigo comes back intermittently. She is sensitive to light with eye pain, ringing in ears, headaches, nausea, and memory issues. Left side feels less to the touch since after her accidents. She also was unable to talk for months in which she states she sounded like she had a stroke. She had seen a concussion specialist in Portland. She is unsure if she has gotten an MRI of brain. As for her headaches she reports having at least ten headaches per month. She has tried medical mariajuana [sic], Tylenol, Ibuprofen, Percocet.

(*Id.* at PageID.1416). He ordered imaging including an MRI of Plaintiff's brain, which resulted in the following impressions:

> 1. Question of minimal cerebellar tonsillar ectopia.
>
> 2. Otherwise, grossly unremarkable noncontrast MRI of the brain.

(*Id.* at PageID.1495–96). Following the MRI, Plaintiff returned to the neurologist who noted that she had a "presumed diagnosis of traumatic brain injury." (*Id.* at PageID.1595, 1599 (capitalization modified)).

On February 24, Plaintiff was evaluated by a consultative examiner. (*Id.* at PageID.1385). Plaintiff reported "that she c[ould] only drive approximately 20 minutes before becoming disoriented and having nausea, eye pain, headaches and balance with substantial increase problems with peripheral vision." (*Id.* at PageID.1386). The examiner listed migraines as one of her impressions from the examination and summarized her findings as follows:

> Based on claimant's history and today's evaluation, in my opinion, numerous mental concerns which are best evaluated by a mental health professional. Regarding physical components, demonstrates an ability to perform many of the physical components asked of her, however, after a few minutes of activity, the claimant did appear to be quite uncomfortable and complained of shortness of breath and had to be reminded to breathe, complained of dizziness, feeling off balance.

(*Id.* at PageID.1388).

At a July 2024 neurology appointment, Plaintiff reported that "loud sounds cause[d] her inability to stand up, fatigue, and severe headache which last[ed] for days." (*Id.* at PageID.1629). In October 2024, Plaintiff presented to the emergency department with a headache. (*Id.* at PageID.1624). A CT of Plaintiff's brain was negative and there were no neurological findings on examination. (*Id.* at PageID.1627).

At the April 2, 2025 hearing, Plaintiff testified she needed help caring for herself, so in November 2023, she moved back to Michigan to live with her mother. (*Id.* at PageID.103–04). She did not take prescription medication to treat her physical symptoms, "explaining [she] get[s] really severe headaches, so [she] can't handle very strong medication." (*Id.* at PageID.113). The ALJ then asked her: "Are the headaches that you're getting . . . different than the migraines you were experiencing at one point?" (*Id.*). To which Plaintiff responded: "No, they're the same. Like if I take certain types of medications I will get like . . . debilitating migraines to where I'm laying on the floor in my bathroom." (*Id.*). When asked

about frequency, Plaintiff responded: "They're not as consistent anymore because I've really reduced my activity and tried to limit movement of my neck now that I know what's wrong with it because before it was almost every other day and now it's happening like probably two times a week." (*Id.*). Thinking a lot and stress were also headache triggers. (*Id.*). Plaintiff could not recall the name of her prescription migraine medication because she preferred to stick to over-the-counter options like ibuprofen as she knew she did not "get any bad side effects from them." (*Id.* at PageID.113–14).

Further facts will be discussed as necessary below.

**F. Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

(i) A licensed or certified psychologist at the independent practice level; or

(ii) A licensed or certified school psychologist, or other licensed

or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3). This factor includes analysis of:

> (i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (ii) Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation."

Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

(i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

(ii) Statements about whether or not [the claimant has] a severe

> impairment(s);
>
> (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;
>
> (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;
>
> (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;
>
> (vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind,

employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in

which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to

work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

> (i) [D]aily activities;
>
> (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi) Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1) The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

> (4) The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G. Argument and Analysis

As stated above, Plaintiff raises three issues but only the first two will be discussed. First, she argues the ALJ erred by failing to consider whether Plaintiff's migraines equaled Listing 11.02B. Second, she argues that the ALJ erred by finding migraines to be a severe impairment but failing to include any related limitations in the RFC.

Plaintiff's first assignment of error requires that she

> do more than point to evidence on which the ALJ could have based her finding to raise a "substantial question" as to whether she has satisfied a listing. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x. 639, at 641–42 (finding claimant did not raise a substantial question as to satisfying the listing for intellectual disability where the ALJ's finding of borderline intellectual functioning simply left open the question of whether he meets a listing and where claimant pointed to only a few pieces of tenuous evidence addressing the listing). Rather, the claimant must point to specific evidence that demonstrates she reasonably could meet or equal every requirement of the listing. *See Sullivan*, 493 U.S. at 530 ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of the criteria, no matter how severely, does not qualify."); *Foster v. Halter*, 279 F.3d 348, 354–55 (6th Cir. 2001) (claimant must satisfy the diagnostic description and one of the four sets of criteria); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (holding that it was not harmless error for the ALJ to fail to

> analyze Step Three as to an impairment found to be severe at Step Two where the claimant put forth evidence that possibly could meet the relevant listing). Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three.

*Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432–33 (6th Cir. 2014) (citation modified). Further, "reversal is not warranted when the ALJ's Step Three conclusion is sufficiently supported by factual findings elsewhere in the decision." *Charvat v. Comm'r of Soc. Sec. Admin*., No. 1:22-CV-02121, 2023 WL 7473760, at *14 (N.D. Ohio Oct. 25, 2023), *report and recommendation adopted sub nom. Charvat v. Kijakaz*i, 2023 WL 7461844 (N.D. Ohio Nov. 9, 2023).

Because the ALJ did not consider Listing 11.02B, the Court "therefore must determine whether the record evidence raises a substantial question as to [Plaintiff's] ability to satisfy each requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432–33. "SSR 19-4p indicates that primary headache disorder is not a listed impairment, but directs consideration of Listing 11.02B or 11.02D, instead, as the 'most closely analogous listed impairment[s].'"[2] *Corinne C. v. Comm'r of Soc. Sec.*,

[2] The record could also support the conclusion that Plaintiff's headaches during the relevant period were secondary to her motor vehicle accidents. SSR 19-4p does apply to secondary headaches. *See Jurcago v. Comm'r of Soc. Sec.*, No. 5:23-CV-01187, 2024 WL 2786694, at *7 (N.D. Ohio May 2, 2024) (citing cases), *report and recommendation adopted*, 2024 WL 2784334 (N.D. Ohio May 30, 2024). However, the ALJ found migraines to be a severe impairment, which forecloses this conclusion. *See* SSR 19-4p, 2019 WL 4169635, at *5 ("We may establish only a primary headache disorder as an MDI. We will not establish secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection) as MDIs because secondary headaches are symptoms of another underlying medical condition. We evaluate the underlying medical condition as the MDI.").

No. 1:20-CV-1034, 2022 WL 1590818, at *19 (S.D. Ohio May 19, 2022) (quoting SSR 19-4p, 2019 WL 4169635, at *7). Listing 11.02B concerns "[d]yscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02B. When ALJs

> evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, [they] consider: a detailed description from an [acceptable medical source (AMS)] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

The ALJ spent little time discussing Plaintiff's headaches in the written decision. This may be in part because several of Plaintiff's regular providers are not acceptable medical sources. (*See, e.g.*, *id.* at PageID.66 ("In addition, a naturopathic doctor and chiropractors are not acceptable medical sources under the Regulations, so their statements are considered only to the extent that it helps understand how an impairment affects the ability to work.")). However, there is evidence on this issue from acceptable medical sources, including from the consultative examiner who saw

Plaintiff in February 2024. Plaintiff told the examiner "that she c[ould] only drive approximately 20 minutes before becoming disoriented and having nausea, eye pain, headaches and balance with substantial increase problems with peripheral vision." (ECF No. 10-1, PageID.1386). The examiner listed migraines as an impression from the examination and noted that "after a few minutes of activity, the claimant did appear to be quite uncomfortable and complained of shortness of breath and had to be reminded to breathe, complained of dizziness, feeling off balance." (*Id.* at PageID.1388). At a neurology appointment around the same time, Plaintiff reported being "sensitive to light with eye pain, ringing in ears, headaches, nausea, and memory issues" and "having at least ten headaches per month. She has tried medical mariajuana [sic], Tylenol, Ibuprofen, Percocet." (*Id.* at PageID.1416).

Along with these detailed descriptions from acceptable medical sources, the record contains many examples of the effects Plaintiff's headaches had on her ability to function. At three different chiropractic appointments during fall 2022, Plaintiff presented with a headache. (*Id.* at PageID.784, 786–87). At the first appointment, Plaintiff said her symptoms included "constant pressure in her head" and sensitivity "to light and sound." (*Id.* at PageID.784). At the third, Plaintiff complained about daily headaches and neck pain as well as light sensitivity. (*Id.* at PageID.787). In a February 2023 email, Plaintiff informed her provider that she planned to get bloodwork done that week "headaches allowing." (*Id.* at PageID.1037). The next

month, Plaintiff told the provider that she was in pain and requested that the lights be turned off for her visit. (*Id.* at PageID.1036). A few weeks later, Plaintiff told the same provider that dealing with insurance paperwork gave her headaches. (*Id.* at PageID.1034).

Moreover, the ALJ's questioning of Plaintiff regarding her migraines is only briefly mentioned in the written decision. At the hearing, Plaintiff testified that she did not take prescription medication to treat her physical symptoms because "[she] get[s] really severe headaches, so [she] can't handle very strong medication." (*Id.* at PageID.113). The ALJ then asked her: "Are the headaches that you're getting . . . different than the migraines you were experiencing at one point?" (*Id.*). To which Plaintiff responded: "No, they're the same. Like if I take certain types of medications I will get like . . . debilitating migraines to where I'm laying on the floor in my bathroom." (*Id.*). When asked about frequency, Plaintiff responded: "They're not as consistent anymore because I've really reduced my activity and tried to limit movement of my neck now that I know what's wrong with it because before it was almost every other day and now it's happening like probably two times a week." (*Id.*). Thinking a lot and stress were also headache triggers. (*Id.*). Plaintiff could not recall the name of her prescription migraine medication because she preferred to stick to over-the-counter options like ibuprofen as she knew she did not "get any bad side effects from them." (*Id.* at PageID.113–14).

The decision says only that "[t]he claimant said migraines are not as consistent lately because of activity modifications she has made, so now she has them about twice per week. She has a prescription medication for migraines, but she does not take it much as she prefers edibles and supplements." (*Id.* at PageID.59). At no point in the decision does the ALJ specifically address whether Plaintiff's reports of subjective symptoms regarding her headaches were consistent with the other evidence of record. It is unknown whether the ALJ credited Plaintiff's testimony regarding the frequency of her migraines. It is also unknown how many migraines per week would be work preclusive, in part, because the ALJ did not include headaches or any limitations resulting from headaches in the hypotheticals posed to the vocational expert. Nor did the ALJ discuss how Plaintiff's sensitivity to light and sound would impact her ability to work. The ALJ also neglected to address whether the frequency of Plaintiff's migraines would be work preclusive given that Plaintiff's primary activity modification to reduce their frequency was moving her neck less. A modification that on its face seems untenable with gainful employment. The ALJ also mentioned that Plaintiff did not like to take her prescription migraine medication but did not address Plaintiff's testimony that she did not like to take prescription medications because strong medications caused her debilitating migraines. *See Charvat*, 2023 WL 7473760, at *17 ("Before concluding that a claimant's alleged medication non-compliance weighs against her allegations of

disability, the ALJ must consider any reasons for such non-compliance. *See* 20 C.F.R. § 404.1530(c).").

In an analogous case, the reviewing court explained:

> Because the ALJ did not mention any of this relevant evidence, I cannot tell whether she considered it and discounted it or merely overlooked it. The failure of the ALJ to explain her disregard of this probative evidence leaves this Court without the ability to meaningfully review whether her conclusions are supported by substantial evidence.

*Id.* at *16. Further, the court noted that "the ALJ's focus should have been on records from the treating providers memorializing [the plaintiff's] statements regarding her migraine headaches, including the duration, intensity, and accompanying symptoms; frequency, adherence to treatment; and limitations associated with the disorder or effect of its treatment." *Id.* Ultimately, the court concluded that the plaintiff

> met her burden to show the record evidence raises a substantial question as to her ability to satisfy a listing. The evidence demonstrates that she could reasonably show her primary headache disorder is equal in severity and duration to the criteria in Listing 11.02(B), including headaches severe enough to require lying down in a dark room and avoiding movement that occur at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

*Id.* at *18. As to whether the RFC was supported by substantial evidence, the court reasoned that the plaintiff

> made numerous statements to her treating providers, in her Adult Function Report, and at the administrative hearing about the limiting effects posed by her migraine headaches, including that she becomes nonfunctional and must lie down when struck by a migraine. Except to note that [the plaintiff] described migraine headaches occurring daily or three to four times a week and reported 'good relief' with Botox

> injections, the ALJ did not acknowledge any other statement [the plaintiff] made about the limiting effects of her headaches, much less evaluate the consistency and supportability of her symptoms with relevant evidence of record. As such, I cannot determine whether the ALJ's RFC is supported by substantial evidence. Remand is required for the ALJ to adequately address all relevant evidence in the record.

*Id.* (citations omitted).

The Undersigned comes to the same conclusions as the *Charvat* court. Here, the ALJ barely discussed Plaintiff's migraines in the written decision, despite finding migraines to be a severe impairment. It is unknown why the ALJ did not discuss Listing 11.02B. It is also unknown why the ALJ did not discuss Plaintiff's headache-related limitations when explaining the RFC finding, much less why the RFC contains no headache-related limitations. As Plaintiff points out in her brief, the lack of mention of her photosensitivity is particularly concerning given how often it is mentioned throughout the record.

For these reasons, the Undersigned suggests that Plaintiff "has raised a substantial question as to Listing 11.02." *Corinne C.*, 2022 WL 1590818, at *19 (faulting ALJ for not discussing treatment records describing plaintiff's typical headaches or plaintiff's headache calendars). Additionally, the RFC is insufficiently explained, leaving the Undersigned unable to determine whether it is supported by substantial evidence. Therefore, remand is recommended. On remand, the ALJ should fully consider Plaintiff's migraines, including whether they equal Listing 11.02B and if they do not, whether they impact the RFC finding. Either way, the

ALJ must sufficiently explain their reasoning.

### H. Conclusion

For these reasons, it is **RECOMMENDED** that Plaintiff's motion for summary judgment (ECF No. 13) be **GRANTED** and the Commissioner's motion (ECF No. 14) be **DENIED**. If these recommendations are adopted, the ALJ's decision will be **VACATED** and this matter **REMANDED** for further administrative proceedings.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant

to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 12, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge